IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SANDISK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. _____ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ROUND ROCK RESEARCH, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

1.     Plaintiff SanDisk Corporation ("SanDisk" or "Plaintiff") brings this action for violation of the antitrust laws because it is the victim of a conspiracy between Defendant Round Rock Research, LLC ("Round Rock" or "Defendant") and Micron Technology, Inc. ("Micron"), and also of Round Rock's monopolization and attempted monopolization of technology licensing markets.

2.     Round Rock is a patent assertion entity created in concert with Micron to acquire and then assert patents that Micron itself could not enforce against SanDisk and its other competitors.  Micron was unable to assert the patents itself because of (1) commitments it had made to a standard-setting organization, the JEDEC Solid State Technology Association ("JEDEC"), (2) commitments Micron had made with respect to patents it had not disclosed to JEDEC, and (3) the risk of countersuit.  After acquiring patents from Micron, Round Rock sought from SanDisk supracompetitive, hold-up royalties for patents that Micron had never disclosed to JEDEC and that Round Rock claimed SanDisk infringed by practicing a JEDEC standard ("the eMMC standard").  When SanDisk did not capitulate to its demands, Round Rock sued seeking above-RAND royalties and treble damages based on undisclosed alleged standard-

essential patents ("undisclosed alleged SEPs").  That is precisely what Micron's then CEO, Steven Appleton, and other Micron employees testified under oath that Micron would not and could not do, and what Micron itself claimed violated the antitrust laws.

3.      Additional background on Micron, JEDEC, and its patent policy is important to understanding the conspiracy orchestrated by and through Round Rock—and Round Rock's monopolization and attempted monopolization of technology licensing markets.

4.      Micron is a global manufacturer of DRAM and NAND flash memory, a competitor of SanDisk, and a long-standing member of JEDEC.  Micron's then CEO—and other Micron employees—testified in a public trial about the importance of JEDEC's patent policy.  As they explained, JEDEC develops "open" standards that industry participants are free to adopt.  According to Micron, JEDEC and its members try not to incorporate patented technology into standards, and thus require disclosure of patents when "there would be a reasonable possibility that the patent was going to be associated with the work of JEDEC."  As Micron explained, JEDEC participants must disclose patents as soon as they know or have reason to know that their company or anyone else's company has patents or patent applications that might involve the work of JEDEC.  Moreover, that duty of disclosure is ongoing.  It requires a patent holder to disclose patents even after JEDEC has adopted a relevant standard, even if the patent issues after the adoption of a standard, and even if the patent holder subsequently leaves JEDEC.  As a member of JEDEC, Micron thus had an obligation to disclose any patents that might involve the work of JEDEC's JC-64 committee and JC-64.1 subcommittee, which developed the eMMC standard upon which Round Rock bases its claims of infringement of the undisclosed alleged SEPs.

2

5.     Micron also made commitments with respect to patents that it did not disclose to JEDEC.  During litigation with a company called Rambus, Micron's then CEO, Steven Appleton, explained JEDEC's intellectual property disclosure rules and the consequences of failing to disclose patents that may relate to a JEDEC standard:  if Micron or another company failed to disclose patents to JEDEC, then it "couldn't come back later and try to enforce those [patents] against the standard that had been developed."  Mr. Appleton testified further and committed that, if Micron failed to disclose a patent to JEDEC, "we certainly wouldn't go out and then try to enforce that against the standard."  Terry Lee, Micron's Executive Director of Advanced Technology and Strategic Marketing, testified similarly:  "if [a company] failed to disclose the patent that may relate to the work of the committee and if it was adopted into the standard, that [company] would forego their right to enforce the patent against the standard."

6.     JEDEC developed its eMMC standard over several years.  During that period, Micron's Strategic Marketing Manager, Victor Tsai, was elected Vice-Chair of JC-64.1, the JEDEC subcommittee that developed the standard.  Similarly, Micron's General Manager and former JEDEC board member, Scott Graham, served as Co-Chairman and later Vice-Chairman of another JC-64 subcommittee.  More than 35 Micron employees attended JEDEC JC-64 meetings—actively participating in the formulation and development of the eMMC standard and becoming subject to JEDEC's patent disclosure obligations.  During the development of the eMMC standard, Frankie Roohparvar—a Micron Vice President and named inventor on patents now claimed by Round Rock to be essential to the JEDEC eMMC standard—gave a public presentation detailing features under discussion at the JEDEC JC-64 committee.  As a result, on information and belief, Micron knew that patents it sold to Round Rock might relate to JEDEC's eMMC standard, and—in the words of the JEDEC patent policy—Micron's employees were

required to disclose to JEDEC "any knowledge they may have of any patents, or pending patents, that might be involved in the work they are undertaking." Moreover, on information and belief, Round Rock knew of Micron's knowledge of relevant patents and its willful failure to disclose those patents to JEDEC when it acquired patents from Micron.

7.     Well aware of its position regarding the JEDEC patent policy and the consequences of failing to disclose patents to JEDEC, Micron never sued SanDisk based on any undisclosed patent supposedly reading on the JEDEC eMMC standard. In 2008 and 2009, however, Micron experienced extreme financial duress (suffering losses well in excess of $1 billion annually) that, on information and belief, drove it to conspire with Round Rock. Seeking to avoid its promises to JEDEC and its promises not to assert undisclosed patents against standards implementers such as SanDisk, Micron decided to monetize its patent portfolio by selling patents to a patent assertion entity. The patent assertion entity would then use the undisclosed (but claimed to be standards essential) patents to hold-up companies like SanDisk. The conspiracy would thus raise the costs of Micron's competitors, and let Micron share in the supracompetitive royalty payments extorted by Round Rock.

8.     Micron thus encouraged John Desmarais, an attorney who had represented it, to create Round Rock. Mr. Desmarais (and thus Round Rock) knew JEDEC's patent policy and its importance. In fact, Mr. Desmarais had represented a company called Infineon Technologies AG in litigation against Rambus that concerned the JEDEC patent policy. In that litigation, Mr. Desmarais gave an opening statement to a jury empanelled in the Eastern District of Virginia in which he explained that the "rules" of the JEDEC patent policy "couldn't be more clear": "Avoid a standard that is patented. Avoid requirements that call for patented technology." He further explained: "when somebody disclosed a patent at JEDEC, things

changed. . . .  No. 1, JEDEC stopped the standardization order on that item. . .  No. 2, JEDEC

designed around the patent. . .  Option 3, they'd get a commitment from the patent[ee] that they

will license everybody for free or on fair, reasonable, non-discriminatory terms. . .  Those are the

three options that happened at JEDEC."

9.     According to UCC Financing Statements filed by Micron, Round Rock acquired

patents from Micron pursuant to a written agreement (the "Patent Sale and Transfer Agreement

('Transfer Agreement') dated December 30, 2009").  According to news reports, Round Rock

agreed to share a percentage of its revenue with Micron.  On information and belief, the

December 30, 2009 agreement reflected Micron and Round Rock's specific intent that Round

Rock hold-up competitors such as SanDisk that practice the JEDEC eMMC standard, and

thereby permit Round Rock to achieve monopoly profits and remit a portion of those monopoly

profits to Micron.

10.     On October 27, 2011, Round Rock made a presentation to SanDisk, targeting

SanDisk's embedded flash drives and other technology products.  Round Rock claimed to have

targeted SanDisk's existing products and to have acquired patents that it alleged read on those

products.  Thus, Round Rock admitted to acquiring patents not for their stand-alone worth, but

for their potential hold-up value against SanDisk's existing products.  Round Rock claimed that

SanDisk's revenue justified royalty payments of $229 million.  This sum bears no economic

relationship to the technological value of the patents.

11.     Round Rock made clear that its infringement contentions relied on SanDisk's

good-faith implementation of a JEDEC standard.  It claimed to have acquired patents reading on

flash-memory products that comply with JESD84-A441, which is a JEDEC eMMC standard.

Round Rock left SanDisk in no doubt as to what would happen if SanDisk refused to pay the

demanded supracompetitive royalties.  Round Rock drew attention to prior suits against HTC, Dell, and Oracle, and threatened to file further lawsuits.

12.     In response to Round Rock's threats, SanDisk filed a declaratory judgment action in late October 2011 in the U.S. District Court for the Northern District of California, seeking to establish that eleven of the patents with which Round Rock had threatened SanDisk were invalid or not infringed.  Round Rock's subsequent actions, however, revealed that it was not concerned with vindicating its intellectual property rights, if any, but with finding and asserting whatever undisclosed alleged SEPs that it could pursuant to the conspiracy to hold-up SanDisk.  Far from limiting its dispute with SanDisk to the eleven patents at issue in the California litigation, Round Rock acquired new patents from Micron in 2012 with which to threaten and sue SanDisk. Round Rock then used the newly acquired patents (and earlier acquired patents) in a lawsuit that it filed in the U.S. District Court for the District of Delaware.

13.     Between the Delaware and California actions, Round Rock claimed that SanDisk infringed nine patents by manufacturing memory products that implement JEDEC's eMMC standard.   These are the 5,615,159; 6,654,847; 6,728,798; 6,948,041; 7,692,984; 7,742,344; 8,023,344; 6,845,053; and 6,570,791 patents (the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents).  SanDisk refers to them as "the undisclosed alleged SEPs."  Seven of those undisclosed alleged SEPs were never revealed to JEDEC in any form.  The remaining two were not disclosed by Micron to JEDEC's JC-64 committee or JC-64.1 subcommittee, and thus, under JEDEC's rules, were not properly disclosed.

14.     As alleged in paragraph 5, Micron promised not to enforce undisclosed alleged SEPs against any company that implements a JEDEC standard.  That licensing commitment encumbers and travels with those patents—as do the commitments Micron undertook as a

JEDEC member.  Therefore, the undisclosed alleged SEPs that Micron assigned to Round Rock remain subject to the royalty-free licensing commitment.

15.     Round Rock's behavior violates federal and state antitrust laws, and constitutes a breach of contract.

a.  First, by acquiring patents that both Micron and Round Rock knew had not been disclosed to JEDEC and then claiming that SanDisk infringes the patents by implementing the JEDEC eMMC standard, Round Rock has unlawfully conspired with Micron to monopolize markets for technology that it asserts is essential to the eMMC standard.   Both Round Rock and Micron have, as described further below, acted with the specific intent of monopolizing these markets.

b.  Second, Round Rock contends that SanDisk's implementation of the JEDEC eMMC standard infringes patents it acquired from Micron but that were not disclosed to JEDEC despite Micron's obligation to do so.  Round Rock not only knew that these undisclosed alleged SEPs had been willfully concealed from JEDEC, but it used those patents precisely because that concealment allowed it to ambush SanDisk.  In taking these actions, Round Rock has illegally monopolized and attempted to monopolize technology markets.  Because these patents were not disclosed by Micron, not previously asserted by Micron, and are now being used to hold-up those implementing the JEDEC eMMC standard, the reasonable and nondiscriminatory ("RAND") royalty rate for these patents is zero.  Indeed, on information and belief, JEDEC could have designed the eMMC standard around the patents if it had been made aware of them.

    c. Third, Round Rock has sought greater than RAND royalties through its pre-litigation presentation, its demand for greater than zero royalties, and its requests for punitive treble damages for what it asserts to be standard-essential patents. Round Rock has thus breached its contractual obligation, inherited from Micron, to disclose those patents and to license them on RAND—here, royalty-free—terms. SanDisk is a third-party beneficiary of that promise. As the RAND licensing obligations run with the patents, Round Rock assumed the burden of Micron's promise to license those patents on RAND (here, royalty-free given Micron's commitments) terms. In seeking more than a royalty-free license (and indeed in demanding treble damages), Round Rock has committed a breach of contract.

16.    For these reasons, and for those explained in more detail below, Round Rock has violated Section 2 of the Sherman Act, the California Cartwright Act and Unfair Competition Law, and has committed a breach of contract.

## PARTIES

17.    Plaintiff SanDisk is a Delaware corporation that has its principal place of business in Milpitas, California.

18.    Defendant Round Rock is a Delaware limited liability company that has its principal place of business in Jersey City, New Jersey.

## JURISDICTION AND VENUE

19.    This Complaint arises under Section 2 of the Sherman Act, 15 U.S.C. § 2; Section 4 of the Clayton Act, 15 U.S.C. § 15; Section 16 of the Clayton Act, 15 U.S.C. § 26; Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*; Section 17200

of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; the Patent

Laws of the United States, 35 U.S.C. §§ 1 *et seq.*; and the Declaratory Judgment Act, 28 U.S.C.

§§ 2201-02.

20.     The Court has subject-matter jurisdiction over the asserted claims under 28 U.S.C.

§§ 1331 and 1367, and 15 U.S.C. §§ 15, 25, and 26.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## JEDEC STANDARDIZES EMBEDDED-MEMORY TECHNOLOGY

### A.     Interoperability Is Critical for Flash-Memory Products

22.     SanDisk is a global leader in flash memory storage solutions that sells, among

other things, iNAND Embedded Flash Drives.  These non-volatile memory and mass-storage

drives serve a critical function in many of today's most ubiquitous products, including

smartphones, tablets, digital cameras, GPS units, and gaming systems.

23.     SanDisk's iNAND solutions are available with an eMMC ("Embedded

MultiMedia Card") interface.

24.     To ensure that embedded flash drives interoperate with the microelectronics

technologies with which they are paired in host devices, industry participants including SanDisk

develop common standards through JEDEC.  For more than half a century, that standard-setting

organization ("SSO") or its predecessors have developed open standards and publications for the

microelectronics industry.

25.     Collaboratively established industry standards possess great value.   SSOs

efficiently produce open standards available for all industry participants to adopt.  By ensuring

that related technology products use a common architecture, SSOs facilitate the emergence of

products that are more attractive to consumers, who value the convenience of interoperability.

Standards also facilitate price- and quality-based competition, hasten product-development time,

prevent companies from investing in the wrong direction, and make it unnecessary for consumers to delay buying their desired products for fear that later developments will render their chosen purchase defunct.

26.     These benefits of standardization are equally true of microelectronics generally and embedded flash memory specifically. JEDEC recognizes these advantages, observing that "JEDEC's collaborative efforts ensure product interoperability, benefiting the industry and ultimately consumers by decreasing time-to-market and reducing product development costs."

27.     The JEDEC committee that develops standards for embedded flash memory is JC-64, whose remit is "Embedded Memory Storage & Removable Memory Cards." One of the technology spaces for which JC-64 develops industry standards is eMMC (again, "Embedded Multi-Media Cards"). In July 2007, JC-64 issued the JESD84-A41 and A42 eMMC standards, and in December of that year published the JESD84-A43 standard. The committee's work in the eMMC space continued. In March 2009, JEDEC published the JESD84-A44 standard, otherwise known as the eMMC v4.4 specification. In March 2010, JEDEC published the JESD84-A441 standard or eMMC v4.41 specification, which replaced eMMC v4.4. That document defined the MMC/eMMC Electrical Interface, as well as the environment and handling of that interface.

**B.      JEDEC Has Strict Rules and Policies to Protect Competition**

28.     An embedded flash-memory interface standard does not comprise a single technology. Rather, it combines myriad discrete functions. Many of those technical functions are subject to nonproprietary solutions, while other functions could be performed using various interchangeable patented technologies. Thus, when industry participants meet in a SSO to identify a standard for their next-generation products, they must choose among alternative technologies that cover many distinct components of the standard. If it were not the case that there are frequently technical alternatives for each feature or function of a given technical

standard, there would be little need for SSOs, a primary purpose of which is to facilitate that selection process among those alternatives.

29.    In this "ex ante" setting—*i.e.*, before the SSO adopts a new standard (or new version of a standard)—a patentee could negotiate with the SSO to have its claimed technology included in the proposed standard. To persuade the SSO to adopt its technology over substitutes, a patentee would compete on the basis of price and quality. The royalty that such a patentee could command ex ante reflects the patent's marginal value over alternative technologies, and is limited by the SSO's ability to choose a non-proprietary or non-infringing standard—that is, to "design around" the asserted patent. The ex ante price for a patent relevant to a proposed standard is thus "a measure of the value of the patent qua patent." *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913 (N.D. Ill. 2012).

30.    Once an SSO chooses a standard and industry adopts it, however, alternative technologies and design-around are no longer available. At that moment, any patents reading on the adopted standard are "standard-essential," such that their owners possess significant market power due to "hold-up." As Judge Posner has explained, "once a patent becomes essential to a standard, the patentee's bargaining power surges because a prospective licensee has no alternative to licensing the patent; he is at the patentee's mercy." *Apple*, 869 F. Supp. 2d. at 913. Indeed, the Third Circuit has observed that, after an SSO adopts a new standard, "[i]ndustry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become 'locked in' to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties

from the industry participants." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007).

31.     JEDEC is well aware of this danger.  Its President, Mr. John James Kelly, testified that "the use of patented technology . . . in JEDEC standards . . . that become industrywide standards has . . . potentially serious implications for the industry and implementation of the standard and for consumers" because "[i]t could lead to higher costs" and "restrictions on distributions," which could potentially be "[c]rippling to the industry[.]"  JEDEC agrees that, "without . . . disclosure and the [licensing] assurances, . . . there's no way for the [JEDEC] committee . . . to know it needs to work around a patent it just doesn't know about[.]"

32.     JEDEC, like other SSOs, has therefore adopted policies designed to protect competition and prevent its members from holding-up firms that implement its chosen standards. In short, JEDEC avoids including patented technology in standards whenever possible, and imposes disclosure and licensing rules.  The JEDEC policies from the period relevant to this lawsuit required all participants attending JEDEC meetings "to inform the meeting of any knowledge they may have of any patents, or pending patents, that might be involved in the work they are undertaking."  JEDEC then asks those members to agree to license the patents on RAND or royalty-free ("RF") terms.  If they refuse to commit to either licensing obligation, JEDEC would not approve a standard on which the disclosed patent reads.

33.     JEDEC has explained the importance of securing a RAND licensing obligation, which it considers to be a "very significant restriction[] on the rights of a patent owner."  It "makes it more likely that the standard that JEDEC promulgates can be adopted by the industry and will become an industry standard and will benefit consumers who, under a RAND assurance,

at least in theory, are not going to be burdened with the same cost pass-throughs for royalties that they would be under a . . . non-RAND standard."

34.    JESD84-A441 (eMMC v4.41) is the standard upon which Round Rock bases its infringement claims against SanDisk.  JEDEC published that standard in March 2010.  In the period leading up to and including that time, JEDEC's intellectual property policies were as follows:

a.    First, JEDEC has stringent disclosure rules. Indeed, "JEDEC's policies [are] designed to ensure that members disclose patents potentially reading on JEDEC standards."  A member's disclosure obligation "continues indefinitely with respect to disclosures that should have occurred when they were members of the organization," even if the company ceases to be a member and even after JEDEC adopts a standard.  Moreover, JEDEC's disclosure policy applies not just to JEDEC members but to all participants attending JEDEC meetings.

b.    Second, when choosing among substitute technologies for a given standard, JEDEC generally chooses nonproprietary technologies over patented ones.  Mr. Kelly testified that "we generally have a preference for avoiding patented items in standards" and that "if, all other things being equal, we had a choice of nonpatented versus patented technology, we would choose the nonpatented technology[.]"  He explained that "JEDEC is especially circumspect about standardization where patented items are involved."  Thus, he agreed that JEDEC policies require diligent efforts to consider alternatives to patented technologies.  Indeed, one of JEDEC's policy documents specifically directs JEDEC committee, subcommittee, and working group chairpersons and

secretaries to "avoid[]" drafting JEDEC standards "that call for the use of patented items."

    c.    Third, JEDEC called on every member that disclosed a patent to commit to license it on RAND or RF terms.  Mr. Kelly explained that, if a member refused to give that guarantee, JEDEC "had to look at workarounds or abandon the activity."  He agreed that, "absent the RAND or royalty-free assurance, that patent would not be incorporated into a JEDEC standard[.]"  Indeed, "if there is . . . a disclosure and a refusal to license, the committee will probably just abandon the activity or try to find a workaround[.]"

    d.    Fourth, Round Rock's co-conspirator, Micron, has testified that if a JEDEC member fails to disclose patents to the JEDEC committee responsible for establishing a particular standard, those patents cannot later be asserted against a third party that implements the standard.  Specifically, Steven Appleton, then Micron's CEO, testified that, "if [a company] fail[ed] to disclose [patents or patent applications], then . . . they couldn't come back later and try to enforce those against the standard that had been developed."  He explained and committed that "we certainly wouldn't go out and then try to enforce that against the standard."  Terry Lee, Micron's Executive Director of Advanced Technology and Strategic Marketing, similarly testified that, "if [a company] failed to disclose the patent that may relate to the work of the committee and if it was adopted into the standard, that [company] would forego their right to enforce the patent against the standard."

35.     In sum, Mr. Kelly testified that JEDEC's "members take the patent policy very seriously, and the expectation that everyone is acting openly in good faith is essential to the development of standards of JEDEC." Further, as Mr. Kelly highlighted in an article distributed to JEDEC members, "[t]here are no intended 'loopholes' in the patent policy. Those who seek to 'game' the rules act at their own peril."

### ROUND ROCK AND MICRON CONSPIRE TO MONOPOLIZE eMMC-TECHNOLOGY MARKETS

36.     Micron is a technology company in the semiconductor industry. It competes with SanDisk in the design and manufacture of NAND flash memory solutions. As a competitor in that industry, Micron has amassed a portfolio of many thousand patents. Given its position, Micron is and has long been an active member of JEDEC, including of JEDEC's JC-64 committee and JC-64.1 subcommittee.

### A.     Micron Influences JEDEC's Development of the eMMC Standard

37.     Micron is a longstanding member of JEDEC's JC-64 committee and JC-64.1 subcommittee, which developed the eMMC 4.41 standard. According to JEDEC, Micron was "an active member of JC-64[.]" Indeed, more than 35 different Micron employees have attended JC-64 committee meetings.

38.     Many of those Micron employees held leadership positions on the committee and on its related subcommittees and task groups, and regularly attended the committee meetings. For instance, Micron's former Strategic Marketing Manager, Victor Tsai, was elected Vice Chair of the JC-64.1 subcommittee in June 2009 for a two-year term, having previously spent time as Vice Chair of the JC-64 committee. As another example, Micron's General Manager and former JEDEC board member, Scott Graham, served as Co-Chairman and later Vice-Chairman of a JC-64 subcommittee.

39.    Micron was no passive observer in JEDEC's JC-64 committee. To the contrary, it actively influenced the path of the eMMC standard under consideration. An illuminative example concerns Frankie Roohparvar, who was the Vice President of NAND Development for Micron in 2006. He is also the named inventor of six patents that Round Rock both acquired from Micron and now alleges read on JEDEC's eMMC standard. Those six patents are the '159; '847; '798; '984; and '2344 patents, which Micron did not disclose to JEDEC at all, and the '791 patent, which Micron did not disclose to JEDEC's JC-64 committee or JC-64.1 subcommittee. In August 2006, Mr. Roohparvar made a presentation at the Flash Memory Summit (a trade conference) in which he presented on the features under discussion at JEDEC's JC-64 committee:



**Proposed New MMC BGA Features**

**Under Discussion at JEDEC (JC-64)**
- **MMC 5.0 Specification**
- **Faster speed interface**
    - **Clock up to 104MHz**
    - **DDR signaling**
    - **Combined would provide** 200MB/s
- **Improved boot-up support**
    - **Boot code protection**
    - **Faster boot code procedure**
- **Multiple devices on a bus**
- **Programmable I/O**
- **Block lock**
- **Sleep mode**

August 2006                         23

### B. Micron Had Full Knowledge of JEDEC's Disclosure and Licensing Rules

40.    Micron knows JEDEC's policies, including its patent-disclosure policy. JEDEC's President, Mr. Kelly, recently testified that Micron was intimately familiar with JEDEC's disclosure rules. According to Mr. Kelly, one of Micron's most frequent attendees of JC-64 meetings, Scott Graham, "was very familiar with the patent policy" of JEDEC. David Ashmore in Micron's legal department was "a strong supporter of [JEDEC's] patent policy." In fact, according to JEDEC, "Micron . . . was one of the . . . leaders in terms of their support of the patent policy."

41.    More generally, JEDEC agrees that its "members are well aware of the patent policy; they review it often; it is memorialized; it's distributed; it's made available to them in numerous ways." For example, in applying to become a JEDEC member, an applicant is required to accept JEDEC's rules and procedures. As part of the online application process, JEDEC specifically points applicants to the JEDEC patent policy: "By checking this box and submitting this application, you agree to be bound to and abide by the rules and procedures of JEDEC, *including the JEDEC patent policy.*" (Emphasis added.) Just next to this checkbox, JEDEC includes direct links to the JEDEC patent policy.

42.    JEDEC reiterates its patent policy at every JEDEC meeting. For example, the electronic sign-in sheet for those attending JC-64 meetings notifies attendees of the patent policy. JC-64 committee meetings also always begin with a review of JEDEC's patent-disclosure and licensing policy, and a statement to all attendees that "[b]y staying in the room, you agree to be bound by the JEDEC rules and operating procedures—including the JEDEC patent policy." As Mr. Kelly testified, "if any JEDEC member doesn't know about the patent policy, I would question whether or not they have actually participated in JEDEC."

43.     JEDEC's policy also requires that companies send representatives with expertise in the relevant technical field to committee meetings.  JEDEC committee representatives from companies must be "qualified technical or engineering representatives of companies producing and/or using the products covered by the scope of their committee."  On information and belief, Micron's representatives on the JC-64 committee and JC-64.1 subcommittee had knowledge of Micron's patented developments in the technology areas related to the work of the committees on which they served, including knowledge of the undisclosed alleged SEPs.

44.     To facilitate the disclosure process under the patent policy, JEDEC offers its members "many opportunities to make a patent disclosure."  A JEDEC member may disclose a patent orally at a committee, sub-committee, or task group meeting.  In response to an oral disclosure at a JEDEC meeting, the committee chair would request either a RAND or RF licensing assurance from the patent holder in the form of a "patent letter" commitment to JEDEC.  Alternatively, that same member may simultaneously disclose the patent and provide the required licensing assurance through a patent letter.

45.     As alleged in paragraphs 83-92, Micron's executives have knowledge of JEDEC policies and have publicly testified to the disclosure and licensing conditions that apply to JEDEC's standard-setting process.  For instance, in support of an action by the FTC against a company that allegedly violated JEDEC's disclosure rules, Micron's then CEO, Steven Appleton, testified before the FTC that, "JEDEC tries to make sure that the participants that are sharing their knowledge with the body that's there and the customers who are there, they try to make sure . . . that we somehow wouldn't be able to come back later and try to apply some intellectual property that . . . we didn't disclose[.]"

46.     Every individual attending JEDEC meetings was under the same duty to disclose patents that might be involved in the committee's work.  Indeed, each of the more than 35 Micron employees, who collectively attended numerous JC-64 committee and subcommittee meetings over the course of many years, was under that strict duty to disclose.

**C.     Micron Conceals Alleged SEPs from JEDEC**

47.     Although it was well versed in JEDEC's disclosure and licensing rules, and participated extensively in JEDEC's eMMC standards committee and subcommittee, Micron never disclosed the '159; '847; '798; '041; '984; '2344; or '053 patents to JEDEC at all; and never disclosed the '3344 and '791 patents to the appropriate JEDEC committee.  Nor has Micron disclosed any of those patents to JEDEC since.

48.     On information and belief, Micron's representatives on the JC-64 committee and related subcommittee knew that the undisclosed alleged SEPs might be relevant to a JEDEC eMMC standard, and nonetheless failed to disclose them to the appropriate JEDEC committee and subcommittee.  Indeed, Micron paid patent maintenance fees and, on information and belief, actively reviewed its patent portfolio on a regular basis.  Accordingly, Micron and the knowledgeable representatives whom it selected to serve on the JC-64 committee and related subcommittee should have known that the undisclosed alleged SEPs were potentially relevant to a JEDEC eMMC standard.  As alleged in paragraph 34, a member's duty to disclose continues even after JEDEC adopts the relevant standard.  Yet, Micron never disclosed the '159, '847, '798, '041, '984, '2344, and '053 patents to JEDEC at all, and never disclosed the '3344 and '791 patents to the relevant JEDEC committee.  The fact that Micron revealed the '3344 and '791 patents to another committee is telling—by definition, Micron knew about those patents and yet decided not to disclose them to JC-64.

49.     As alleged below in more detail, Micron transferred the undisclosed alleged SEPs to Round Rock pursuant to a conspiracy to monopolize technology markets comprised of those patents.  Round Rock contends that SanDisk infringes each of those patents in making embedded flash drives that comply with JEDEC's eMMC 4.41 standard.

### D.     Round Rock and Micron Conspire to Hold-Up Implementers of JEDEC's eMMC Standard

50.     Micron experienced financial distress throughout 2008 and 2009.  Its Form 10-K for the fiscal year ended August 28, 2008 disclosed that it had "reported negative gross margins and substantial losses in recent periods.  In 2008, the Company reported a net loss of $1.6 billion."  Micron observed that it "faces intense competition in the semiconductor memory markets from . . . SanDisk Corporation" and others which "have significantly expanded the scale of their operations."  It disclosed that "[s]ome of our competitors are large corporations or conglomerates that may have greater resources to withstand downturns in the semiconductor markets in which we compete, invest in technology and capitalize on growth opportunities."

51.     The following year was even worse for Micron.  Its Form 10-K for the fiscal year ended September 3, 2009 disclosed that, "[i]n 2009, the Company reported a net loss of $1.8 billion[.]"  The filing explained that Micron was "focused on improving its Memory segment's competitiveness by developing new products, advancing its technology and reducing costs."

52.     These financial difficulties led Micron to take steps to monetize its patent portfolio.  Indeed, its 2009 Form 10-K disclosed that, "[i]n recent years, the Company has recovered some of its investment in technology through sales of intellectual property rights to . . . other third parties.  The Company is pursuing additional opportunities to recover its investment in intellectual property through additional sales or licenses of intellectual property[.]"

53.     On information and belief, Micron knew that it had failed to disclose the '159, '847, '798, '041, '984, '2344, and '053 patents to JEDEC, and the '3344 and '791 patents to the appropriate JEDEC committee.  Micron had previously sued Rambus for allegedly holding-up implementers of a JEDEC standard with undisclosed SEPs.  *See* ¶¶ 83-86 *infra*.  Therefore, Micron knew that undisclosed alleged SEPs can be used profitably to hold-up companies that implement a standard.  But Micron was and is intimately aware of JEDEC's disclosure policies. *Id.* ¶¶ 40-46.  Micron also knew that, under JEDEC's policies, an undisclosed alleged SEP cannot be used to hold-up a company for implementing a JEDEC standard, and publicly committed that it would not do so.  *Id.* ¶¶ 83-92.  It also knew that enforcing undisclosed alleged SEPs against implementers of a standard constitutes unlawful monopolization.  *Id.* ¶¶ 83-86. Finally, it was no secret that, should Micron itself attempt to assert undisclosed alleged SEPs against its competitors for implementing JEDEC's eMMC standard, it would violate its commitments and suffer both a patent-infringement countersuit and a loss of standing in the industry.

54.     For these reasons, Micron knew that it could not monetize its patents on its own and thus it did not assert any of them.  To realize high levels of revenue from its patent portfolio and to increase the costs of its competitors, which it acknowledged to be better placed to weather the 2008-2009 storm, Micron needed to assign its patents to a company motivated to sue its rivals.  The ideal solution was to find a "patent assertion entity"—a company that does not build any products, for which reason it is invulnerable to patent-infringement countersuit, and that specializes in offensive patent assertion.

55.     But even better than finding a patent assertion entity was to create one specifically to assert Micron's patents.  Micron turned to a lawyer who had represented it in patent litigation,

John Desmarais.  On information and belief, Mr. Desmarais and Micron discussed creating a purpose-built patent assertion entity, which would purchase certain of Micron's patents, including undisclosed alleged SEPs, and assert them against Micron's competitors.

56.     Pursuant to their agreement, on information and belief, Mr. Desmarais formed Round Rock as a Delaware limited liability company on or about December 19, 2008.  Around that time, on information and belief, Micron and Mr. Desmarais discussed the sale by Micron to Round Rock of approximately 4,200 patents and patent applications.  Round Rock and Micron consummated that transaction in 2009.  As part of the sale, Micron assigned to Round Rock at least five undisclosed alleged SEPs—namely, the 6,570,791; 6,845,053; 6,654,847; 6,728,798; and 6,948,041 patents—on December 23, 2009.  At no time prior to December 23, 2009 (nor at any time since) has Micron disclosed those patents to JEDEC's JC-64 committee.

57.     The December 23, 2009 assignment was not a one-time sale.  Later, Micron assigned yet more undisclosed alleged SEPs to Round Rock.  It assigned the 5,615,159; 7,692,984; 7,742,344; and 8,023,344 patents to Round Rock on March 16, 2012.  At no time prior to March 16, 2012 (nor at any time since) has Micron disclosed those patents to JEDEC's JC-64 committee.  As alleged in greater detail in paragraphs 66-81 below, Round Rock promptly asserted those patents against SanDisk.

58.     On information and belief, Micron knowingly concealed the '159, '847, '798, '041, '984, '2344, and '053 patents from JEDEC altogether, and knowingly concealed the '3344 and '791 patents from JC-64 and JC-64.1.  Furthermore, on information and belief, Micron did not assert those undisclosed alleged SEPs because of its knowledge of JEDEC's rules and its commitment, and transferred them and other patents to Round Rock to hold-up its competitors, including SanDisk.

59.     Round Rock was just as familiar with JEDEC's patent policy as Micron was. Round Rock's founder, John Desmarais, served as counsel for Infineon Technologies AG in litigation against Rambus involving JEDEC's policies.  Mr. Desmarais presented an opening statement to the jury empanelled in the Eastern District of Virginia to hear that case.  According to Mr. Desmarais, JEDEC's "rules couldn't be more clear . . . .  Avoid a standard that is patented.  Avoid requirements that call for patented technology."  He further explained: "when somebody disclosed a patent at JEDEC, things changed. . . .  No. 1, JEDEC stopped the standardization order on that item. . .  No. 2, JEDEC designed around the patent. . .  Option 3, they'd get a commitment from the patent[ee] that they will license everybody for free or on fair, reasonable, non-discriminatory terms. . .  Those are the three options that happened at JEDEC."

60.     Round Rock acquired the alleged SEPs from Micron subject to the RAND and RF licensing commitments that had already attached to those patents; such encumbrances run and stay with alleged SEPs, as the Federal Trade Commission has recognized in its action against N-Data.  *See In re Negotiated Data Solutions LLC*, File No. 051 0094, Analysis of Proposed Consent Order to Aid Public Comment, pp. 3, 6 (Jan. 23, 2008).

61.     Micron failed to disclose any of the alleged SEPs that Round Rock claims are infringed by practicing the JEDEC eMMC standard to JEDEC's JC-64 or 64.1 committees prior to assigning those patents to Round Rock.

**BUT FOR THE NONDISCLOSURE, JEDEC WOULD HAVE CHOSEN A NON-INFRINGING eMMC STANDARD OR SECURED A RAND LICENSING GUARANTEE**

62.     As alleged in paragraph 34, JEDEC favors nonproprietary technologies over patented ones.  Indeed, it "take[s] great care with regard to whether a standard incorporates patented technology[.]"

63.     On information and belief, had the undisclosed alleged SEPs been revealed to the JC-64 committee and JC-64.1 subcommittee, JEDEC would have identified and chosen nonproprietary, alternative technologies to include in its eMMC standard.  In other words, on information and belief, JEDEC would and could have designed around the undisclosed alleged SEPs had they been revealed to the JC-64 committee or JC-64.1 subcommittee.

64.     If the alleged SEPs had been disclosed, JEDEC would have required at a minimum that Micron agree to license them on RAND or RF terms.  If Micron had refused to give such a licensing guarantee, JEDEC would not have published the JESD84-A441 standard. Indeed, it would have been irrelevant whether the undisclosed alleged SEPs in fact read on the proposed JESD84-A441 standard or not.  If there had been a "reasonable claim of essentiality" as to any of the undisclosed alleged SEPs, JEDEC would not have published the JESD84-A441 standard without first designing the standard unambiguously to avoid those patents or securing a RAND or RF licensing commitment.

65.     Had Micron revealed the undisclosed alleged SEPs, JEDEC would have designed the eMMC standard to avoid those patents, secured a commitment that Micron would license on RAND or RF terms, or—in the absence of such a promise—abandoned the proposed eMMC standard altogether.  Micron would have granted a RAND or RF licenses had it disclosed the alleged SEPs.  Indeed, Micron has disclosed SEPs to JEDEC and agreed to license those patents

royalty-free to those implementing the relevant standard.    And, Micron has not sued implementers of the JEDEC eMMC standard using undisclosed alleged SEPs.

## ROUND ROCK HOLDS-UP SANDISK WITH UNDISCLOSED ALLEGED SEPS

### A.    Round Rock Demands $229 Million, Violating its RAND Licensing Duties

66.    SanDisk met with Round Rock in October 2011 and was greeted with a demand for $229 million.  Round Rock targeted SanDisk's iNAND embedded flash drives, microSD cards, and solid-state drives, and explained that it held patents allegedly essential to JEDEC's eMMC standard.  Claiming to have acquired some 4,200 patents and applications from Micron in late 2009, Round Rock bolstered its demand for nearly a quarter-of-a-billion dollars with threats of litigation.

67.    Round Rock showed SanDisk a chart that purported to break down the proportion of its approximately 4,200 patents and applications into different technology categories.  The majority of those categories had and have no relevance to SanDisk's business.

68.    Round Rock did not provide SanDisk with claim charts or other materials explaining why SanDisk's products infringe any of Round Rock's patents.  Instead, it confronted SanDisk with conclusory assertions of infringement to "justify" the demanded price of hundreds of millions of dollars.  Purporting to have thousands of patents, Round Rock specifically identified just a handful.  It claimed to have acquired patents relevant to SanDisk's flash-memory products, and stated that those patents read on a JEDEC memory standard that SanDisk has implemented.

69.    Using undisclosed alleged SEPs as a lever with which to attempt to extract hundreds of millions of dollars from a company is inconsistent with a RAND commitment.  Moreover, as alleged in paragraphs 83-92, Round Rock's co-conspirator has committed not to assert undisclosed alleged SEPs against a company implementing a JEDEC standard.  As a

result, Round Rock's pursuit of royalties for the undisclosed alleged SEPs violates the encumbrances attached to those patents.

**B.      Round Rock Asserts Two Undisclosed Alleged SEPs in the Northern District of California**

70.      In response to Round Rock's threats and licensing demand of $229 million, SanDisk filed a declaratory judgment action in the U.S. District Court for the Northern District of California. *SanDisk Corp. v. Round Rock Research LLC*, No. 3:11-cv-05243-RS, Dkt. 1 (N.D. Cal., Oct. 27, 2011). SanDisk sought a declaratory judgment that the patents with which Round Rock had threatened it were invalid and not infringed.

71.      Round Rock filed counterclaims, alleging that SanDisk was infringing the '053 and '791 patents "by making . . . . iNAND eMMC embedded flash drives . . . that comply with SanDisk's eMMC v4.41 specification and JEDEC Standard JESD84-A441[.]" *SanDisk Corp. v. Round Rock Research LLC*, No. 3:11-cv-05243-RS, Dkt. 226, ¶¶ 207-17, 229-39 (N.D. Cal.). Round Rock seeks royalties that are far above RAND royalties for these alleged SEPs in the Northern District of California action.

72.      Micron never disclosed the '053 patent to JEDEC in any form, and it never disclosed the '791 patent to the appropriate JEDEC committee. In deposition testimony, Mr. Kelly of JEDEC explained that revealing a patent to one JEDEC committee does not discharge a member's disclosure obligations as to another committee.

73.      As alleged above, and on information and belief, JEDEC would have altered its eMMC standard to ensure that it did not implicate the alleged SEPs had Round Rock's co-conspirator disclosed them. Round Rock's conspiratorial assertion of the '053 and '791 patents thus constitutes unlawful monopolization under *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), and related authority.

74.     Round Rock's assertion of those undisclosed alleged SEPs also violates the RAND licensing obligations with which they are encumbered.   Its co-conspirator, Micron, committed that it would not assert undisclosed alleged SEPs and seek royalties based on implementation of a JEDEC standard.   In addition, it is by asserting those handpicked patents that Round Rock seeks to coerce SanDisk into paying hundreds of millions of dollars, which amount has no conceivable relationship to RAND licensing terms.

75.     In addition, Round Rock seeks treble damages for willful infringement.   *SanDisk Corp. v. Round Rock Research LLC*, No. 3:11-cv-05243-RS, Dkt. 226, p. 35 (N.D. Cal. Aug. 28, 2013).   It has no basis whatsoever to seek such damages.   The fact that SanDisk will not accede to unreasonable and discriminatory licensing terms does not make it a willful infringer.   Round Rock's pursuit of treble damages violates the RAND licensing guarantee that attaches to the '053 and '791 patents.

76.     In pursuing infringement counterclaims based on the '053 and '791 patents, seeking royalties that are far above RAND royalties, and in seeking treble damages for willful infringement, Round Rock is conspiring to monopolize, attempting to monopolize, and monopolizing technology-licensing markets relevant to JEDEC's eMMC standard.

**C.     Round Rock Asserts Seven Undisclosed Alleged SEPs in This District**

77.     On May 3, 2012, Round Rock filed a patent-infringement lawsuit against SanDisk in this District.   *See Round Rock Research, LLC v. SanDisk Corp.*, C.A. No. 12-569-SLR, D.I. 1 (D. Del. May 3, 2012).   Eleven days later, it filed an amended complaint, asserting undisclosed alleged SEPs against SanDisk.   Specifically, Round Rock claimed that SanDisk had infringed the '159, '847, '798, '041, '984, '2344, and '3344 patents "by making . . . iNAND eMMC embedded flash drives . . . that comply with SanDisk's eMMC v4.41 specification and JEDEC Standard JESD84-A441." (*Id.* D.I. 5.)

78.    In asserting these undisclosed alleged SEPs against SanDisk, Round Rock is conspiring to monopolize, attempting to monopolize, and monopolizing technology licensing markets relevant to JEDEC's eMMC standard.

79.    As alleged above, and on information and belief, JEDEC would have altered that standard to ensure that it did not implicate the alleged SEPs had Round Rock's co-conspirator disclosed them.   Round Rock's conspiratorial assertion of the '159, '847, '798, '041, '984, '2344, and '3344 patents thus constitutes unlawful monopolization under *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), and related authority.

80.    Round Rock's assertion of those undisclosed alleged SEPs also violates the licensing obligations with which they are encumbered.   Its co-conspirator, Micron, committed that it would not assert undisclosed alleged SEPs and seek royalties based on implementation of a JEDEC standard.   By asserting the '159, '847, '798, '041, '984, '2344, and '3344  patents, Round Rock seeks to coerce SanDisk into paying hundreds of millions of dollars, which has no conceivable relationship to RAND licensing terms.

81.    Furthermore, Round Rock seeks treble damages for willful infringement. *See Round Rock Research, LLC v. SanDisk Corp.*, C.A. No. 12-569-SLR, D.I. 1 (D. Del. May 3, 2012).   It has no basis whatsoever to seek such damages.   Indeed, as Judge Posner has explained, "a FRAND royalty starts with what the cost to the licensee would have been of obtaining, just before the patented invention was declared essential to compliance with the industry standard, a license for the function performed by the patent." *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d. 901, 913 (N.D. Ill. 2012) (Posner, J., by designation).   Thus, a demand for treble damages necessarily contradicts a RAND licensing obligation.   No licensee would pay three times the reasonable royalty for a patent that had not yet been incorporated in a standard.   Round Rock's

pursuit of treble damages violates the RAND licensing guarantee that attaches to the '159, '847, '798, '041, '984, '2344, and '3344 patents and also breaches the commitments made by Micron with respect to undisclosed alleged SEPs.

## ROUND ROCK'S CO-CONSPIRATOR HAS CONDEMNED HOLD-UP USING SEPS

82.     Round Rock knows that JEDEC required Micron to disclose the purported SEPs at issue in this case.  In publicized litigation over many years against Rambus, Round Rock's co-conspirator, Micron, explained that JEDEC requires forthright disclosure of potentially essential patents, that a failure to disclose constitutes unlawful monopolization, and that the appropriate RAND licensing royalty for an undisclosed alleged SEP is zero.  Micron also filed an amicus brief in an action brought by the Federal Trade Commission ("FTC") against Rambus for non-disclosure of SEPs to the same effect.  Round Rock's initial CEO, John Desmarais, was a signatory to that brief, on behalf of Infineon Technologies AG.  Furthermore, Micron testified in that FTC case that a company that failed to disclose a patent during standard setting may not later enforce that patent against the emerging standard.  These concessions by Round Rock's co-conspirator make clear that Round Rock's assertion of the supposed SEPs in this case is illegal—and that both Micron and Round Rock share a specific intent to hold-up companies practicing JEDEC's standards:  a hold-up of the kind that Micron and Round Rock's Mr. Desmarais have urged constitutes a violation of the Sherman Act.

### A.     Micron Has Alleged That It Is Illegal to Conceal and Later to Assert SEPs

83.     On August 28, 2000, Micron filed an antitrust lawsuit against Rambus based on Rambus's assertion of patents relating to dynamic random access memory ("DRAM") technology.  During the 13-year history of that lawsuit, Micron made countless statements that confirm that its conspiracy with Round Rock leading up to the present lawsuit is unlawful.

84.     Micron's Second Amended Complaint, filed on September 5, 2007, alleged that Rambus had failed to disclose SEPs to JEDEC, which had been setting open standards for the semiconductor-memory industry.   According to Micron, Rambus had "subverted the open standards process so that it could gain monopoly control over the [standardized technology and corresponding product markets]."   "Rambus kept its patents and applications secret, while participating in the open standards meetings of the association[,] . . . [and] defrauded and misled Micron and other members of the association."   Because "Rambus intentionally withheld information it was required to reveal," Micron averred, Rambus violated "both the antitrust laws and its contractual obligations."

85.     Micron observed that abusing the standard-setting process is anticompetitive and illegal.  It explained that "Rambus' failure to disclose prevented the other association members from (1) negotiating reasonable license terms at the time, before Rambus gained the enormous leverage it now has because of the billions of dollars the industry has invested in reliance on Rambus' non-disclosure of its patent claims and/or (2) developing standards that avoided the asserted scope of Rambus' patents."   And Micron condemned the fact that "Rambus ha[d] filed lawsuits against those manufacturers who [*sic*] do not agree to its terms."

86.     Micron claimed that it was "entitled to an implied, royalty-free license" to the non-disclosed patents and pending or future applications claiming priority through those patents. Micron argued that it was entitled to a royalty-free license on account of Rambus' failing to disclose and later asserting SEPs—precisely the conduct that Round Rock and Micron carried out through their conspiracy.

**B.      Round Rock and Micron Cannot Argue that JEDEC Disclosure Rules Did Not Require Disclosure of the Purported SEPs**

87.      On April 16, 2004, Micron filed an amicus brief with the FTC concerning the agency's action against Rambus.  Its brief decried "Rambus's efforts to undermine JEDEC's pro-competitive standard-setting process and convert JEDEC into a vehicle for Rambus's own anticompetitive, monopolistic ends."  It explained that "JEDEC has a comprehensive patent disclosure policy that requires members to disclose that they have patents and patent applications that might be involved in the standardization work of JEDEC."  Such disclosure, Micron emphasized, "allows members to opt for other, non-proprietary technologies in JEDEC's standards (*i.e.*, to 'design-around' the patent rights) or, at the very least, negotiate the best royalty rate they can *before* incorporating the technology into a standard." (Emphasis in original.)

88.      According to Micron's brief, JEDEC's policy required disclosure of SEPs. Micron also explained that knowingly breaching JEDEC's disclosure obligation and then asserting previously concealed SEPs constitute unlawful monopolization:

> Rambus gained this monopoly by knowingly breaching its duty of disclosure and engaging in exclusionary conduct.  Rambus went to JEDEC meetings as a member, learned what was being considered by fellow members, and then secretly wrote and filed patent claims that attempted to "read on" the standards under consideration.  Rambus *intended* to "mire" the industry "in a big intellectual property trap."  It did so by lulling JEDEC members into a false belief that they were adopting standards on which Rambus would *not* have any claims. In fact, Rambus withdrew from JEDEC to avoid disclosing that it had pending patent rights that it believed were relevant to JEDEC's work. (Emphasis in original; internal citations omitted.)

89.      In an account that could have been tailor-made to describe Round Rock and Micron's conspiracy to assert undisclosed alleged SEPs, Micron argued that:

> [o]nce the standards were adopted by JEDEC, customers demanded standardized products and DRAM manufacturers . . . made their products to those standards. The industry quickly became 'locked in' to the standards as adopted. *Only then* did Rambus surface with its patent claims, demanding high royalty payments

from all of the manufacturers . . . who [*sic*] needed to produce memory chips that complied with JEDEC's standards. (Emphasis in original.)

90.     Finally, Micron's amicus brief explained that, regardless of whether a component of a standard is optional, disclosure of a potential SEP to JEDEC is nevertheless mandatory. Micron explained that the "JEDEC Manual specifies that disclosure is required whenever a patent or application 'might be involved' in JEDEC's work." Ultimately, "[w]henever a JEDEC member tried to enforce undisclosed patent rights against JEDEC standards, JEDEC and its members made clear that such conduct was unacceptable and a violation of JEDEC policy."

### C.     Consistent with Its Understanding of JEDEC's Policies, Micron Publicly Commits Never to Assert an Undisclosed Patent Against a JEDEC Standard

91.     As part of the FTC's administrative action against Rambus, Micron's then CEO, President, and Chairman of the Board of Directors, Steven Appleton, testified that, "[i]f [a company] fail[ed] to disclose [patents or patent applications], then . . . they couldn't come back later and try to enforce those against the standard that had been developed." Terry Lee, Executive Director of Advanced Technology and Strategic Marketing for Micron, similarly testified that, "if [a company] failed to disclose the patent that may relate to the work of the committee and if it was adopted into the standard, that [company] would forego their right to enforce the patent against the standard." Mr. Lee also testified that the goal of JEDEC's patent-disclosure policy "was to be able to allow the committee to avoid the use of patents and incorporating them in the standard."

92.     These public, sworn statements by Micron's senior-most executives do not simply reflect Micron's understanding of JEDEC's patent policies. They constitute a binding commitment on the part of Micron never to assert patents that it failed to disclose to JEDEC against companies for implementation of a JEDEC standard.

## COUNT I

**Monopolization of Technology Markets in Violation of Section 2 of the Sherman Act**

93.     SanDisk repeats and realleges each and every allegation of its Complaint.

94.     Round Rock acquired nine undisclosed alleged SEPs from Micron to ambush SanDisk and to demand greater than reasonable royalties.  On information and belief, Round Rock knew that Micron had deliberately failed to disclose the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents to JC-64 or JC-64.1.  In carrying out these actions, Round Rock willfully acquired monopoly power in relevant technology markets, and did not do so as a consequence of a superior product, business acumen, or historic accident.

95.     Micron, from which Round Rock purposefully acquired the concealed SEPs, previously brought a monopolization claim against Rambus for concealing SEPs and then seeking supracompetitive royalties.  Micron then explained:

> Collectively, the JEDEC Disclosure Policy and the EIA Licensing Policy serve two important purposes: (1) they provide the industry an opportunity to develop standards free from potential blocking patents and (2) they ensure that licenses to patent rights that do exist are offered to members of JEDEC for free or for a reasonable and non-discriminatory royalty.  The JEDEC Disclosure Policy also allows JEDEC and its members to design around such potential or actual patent rights if JEDEC members are unable to obtain a license under satisfactory terms.

96.     Concealing SEPs from a standard-setting organization undermines these two key benefits.  As the Third Circuit has recognized, "patent hold-up" occurs when a standard-setting body like JEDEC "complete[s] its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented.  When this occurs, the patent holder is in a position to 'hold up' industry participants in implementing the standard [because they are] . . . locked in.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007).

97.     Round Rock acquired patents that it knew Micron had failed to disclose to JEDEC. It obtained these patents—specifically, the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents—so it could argue that SanDisk's implementation of the eMMC 4.41 standard constituted patent infringement. Round Rock knew that it could hold-up SanDisk based on its lock-in to JEDEC's eMMC standard. That lock-in would enable Round Rock to extort monopoly profits that it could not have commanded had Micron disclosed the purported SEPs to the JC-64 committee and JC-64.1 subcommittee.

98.     Based on Round Rock's allegations, each of the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents constitutes its own technology market. As the Third Circuit has held, "the incorporation of a patent into a standard . . . makes the scope of the relevant market congruent with that of the patent." *Broadcom*, 501 F.3d at 315. Because of lock-in, no reasonable interchangeability is possible.

99.     Round Rock demands sums that far exceed reasonable royalties for the undisclosed patents it claims are SEPs. First, it has claimed a right to $229 million in royalties for a license to its portfolio: an amount that bears no relation to a hypothetical *ex ante* royalty negotiation. The tool that Round Rock is using to coerce SanDisk into paying this hold-up sum is the alleged SEPs. Second, Round Rock has sought above-RAND royalties, including in Northern District of California action. Third, Round Rock seeks treble damages for willful infringement, even though such a demand violates a RAND commitment and Micron's commitments not to seek any royalties from standards implementers with respect to undisclosed alleged SEPs. Fourth, Micron's purposeful non-disclosure renders the purported SEPs unenforceable, and thus properly subject to royalty-free licensing. Round Rock's co-conspirator, Micron, has recognized this to be the case in its antitrust monopolization action against Rambus.

Finally, had Micron disclosed the alleged SEPs, JEDEC could nevertheless have chosen different technologies or, at the very least, secured a RAND or RF license commitment. The consequence of Micron's nondisclosure, of course, is that the RAND licensing rate is now RF.

100.    Round Rock's monopolization of technology markets has caused SanDisk, as an implementer of the JESD84-A441 standard and purchaser in those markets, to suffer antitrust injury. The harm that SanDisk has experienced is injury of the type that the antitrust laws were intended to prevent and that flows from what makes Round Rock's acts unlawful.

   a. First, Round Rock has forced SanDisk to accept one of multiple anticompetitive injuries to its business. Round Rock's monopolization means that San Disk must either stop manufacturing the embedded flash drives that Round Rock accuses of infringement, pay supracompetitive royalties and suffer higher production costs, or continue to pay the millions of dollars in costs and attorneys' fees required to defend multiple litigations. In asserting undisclosed alleged SEPs against implementers of JEDEC standards, companies abusing the standard-setting process impose great costs on industry. For instance, the former CEO of Round Rock's co-conspirator, Micron, testified that Rambus's hold-up of the DRAM industry cost Micron tens of millions of dollars and distracted valuable staff resources.

   b. Second, Round Rock's hold-up of memory-product manufacturers with supposed SEPs incents SanDisk to focus its technology and product development on areas lying clearly within the zone of freedom that its own patent portfolio provides, and to avoid standards using technologies over which patent assertion entities like Round Rock may later unexpectedly claim patent rights. Indeed, the

former CEO of Round Rock's co-conspirator, Steven Appleton, previously testified that failure by other JEDEC members to disclose would discourage Micron from participating in the standard-setting process in the future.

c.   Third, Round Rock has imposed costs on SanDisk in the form of its executives' and employees' time in negotiating with Round Rock, and has forced SanDisk to operate under the shadow of litigation, all while being subject to licensing demands of more than a hundred million dollars.

## COUNT II

**Conspiracy to Monopolize Technology Markets in Violation of Section 2 of the Sherman Act**

101.   SanDisk repeats and realleges each and every allegation of its Complaint.

102.   Round Rock and Micron have conspired to monopolize technology markets limited to the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents by locking in memory product manufacturers and then holding them up.

103.   As alleged above, this conspiracy had several components.   First, Micron intentionally failed to disclose the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents to JEDEC's JC-64 committee and JC-64.1 subcommittee.   JEDEC relied on this non-disclosure in developing its eMMC standard—a development process in which Micron was intimately involved.   Second, suffering acute financial distress, Micron decided to monetize its portfolio and agreed with its former attorney, Mr. Desmarais, that the latter would create a patent-assertion entity to take ownership of and to assert certain of Micron's patents suitable for holding-up SanDisk and other of Micron's competitors.   Third, in a series of transfers, Round Rock took ownership of the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents.

Finally, Round Rock brought the conspiracy to fruition by holding-up SanDisk and seeking greater than RF royalties for the undisclosed alleged SEPs.

104. Thus, Round Rock and Micron have held-up SanDisk and others by concealing alleged SEPs and assigning them to Round Rock, which, as a patent assertion entity, can hold-up implementers of the eMMC standard without risking a patent-infringement countersuit. Both Round Rock and Micron have taken overt acts in furtherance of this conspiracy that evidence their specific intent to monopolize. For example, Micron misled JEDEC by failing to disclose the purported SEPs, guided JEDEC toward adopting a standard that Round Rock now claims is infringed by claims of the undisclosed alleged SEPs, and then assigned the purported SEPs to Round Rock for the purpose of their being monetized (with Micron receiving a portion of the proceeds). With full knowledge that Micron had failed to disclose the purported SEPs to JEDEC, Round Rock threatened SanDisk with infringement suits based on SanDisk's compliance with the JEDEC standard, and then asserted the alleged SEPs, arguing in its infringement contentions that SanDisk's compliance with JEDEC's standard showed its infringement of the undisclosed alleged SEPs.

105. The conspiracy to monopolize has caused SanDisk, as an implementer of the eMMC standard and purchaser in technology markets, to suffer antitrust injury. The harm that SanDisk has experienced is injury of the type that the antitrust laws were intended to prevent and that flows from what makes Round Rock's acts unlawful.

a. First, Round Rock has forced SanDisk to accept one of multiple anticompetitive injuries to its business. Round Rock's monopolization means that San Disk must either stop manufacturing the embedded flash drives that Round Rock accuses of infringement, pay supracompetitive royalties and suffer higher

production costs, or continue to pay the millions of dollars in costs and attorneys' fees required to defend multiple litigations. In asserting undisclosed alleged SEPs against implementers of JEDEC standards, companies abusing the standard-setting process impose great costs on industry. For instance, the former CEO of Round Rock's co-conspirator, Micron, testified that Rambus's hold-up of the DRAM industry cost Micron tens of millions of dollars and distracted valuable staff resources.

b. Second, Round Rock's hold-up of memory-product manufacturers with supposed SEPs incents SanDisk to focus its technology and product development on areas lying clearly within the zone of freedom that its own patent portfolio provides, and to avoid standards using technologies over which patent assertion entities like Round Rock may later unexpectedly claim patent rights. Indeed, the former CEO of Round Rock's co-conspirator, Steven Appleton, previously testified that failure by other JEDEC members to disclose would discourage Micron from participating in the standard-setting process in the future.

c. Third, Round Rock has imposed costs on SanDisk in the form of its executives' and employees' time in negotiating with Round Rock, and has forced SanDisk to operate under the shadow of litigation, all while being subject to licensing demands of more than a hundred million dollars.

## COUNT III

**Attempted Monopolization of Technology Licensing Markets in Violation of Section 2 of the Sherman Act**

106.    SanDisk repeats and realleges each and every allegation of its Complaint.

107.    Round Rock took ownership of the alleged undisclosed SEPs.  On information and belief, it knew that none of those patents had been disclosed to JEDEC.  It also knew that JEDEC required the disclosure of any patent potentially relevant to one of its proposed or actual standards, and that any disclosed patent must be subject to RAND or RF licensing commitments or JEDEC will not proceed with the proposed standard.  Furthermore, Round Rock knew that JEDEC's rules and practices do not allow owners of undisclosed alleged SEPs to demand positive royalties from companies for implementing the relevant JEDEC standard.

108.    Although its undisclosed alleged SEPs were subject to RAND—here, RF—licensing encumbrances, Round Rock approached SanDisk, demanding non-RAND licensing terms on threat of lawsuit.  It promptly followed up on that threat, claiming in court that SanDisk infringes the undisclosed alleged SEPs by making embedded flash drives that comply with JEDEC's eMMC standard, and seeking punitive treble damages.  In taking these actions, Round Rock has acted with the specific intent to monopolize technology markets.

109.    Based on Round Rock's allegations, each of the '159, '847, '798, '041, '984, '2344, '3344, '053, and '791 patents constitutes its own technology market.  As the Third Circuit has held, "the incorporation of a patent into a standard . . . makes the scope of the relevant market congruent with that of the patent."  *Broadcom*, 501 F.3d at 315.  Because of lock-in, no reasonable interchangeability is possible.

110.    There is a dangerous probability that Round Rock's anticompetitive conduct in knowingly acquiring undisclosed alleged SEPs that it considers to read on a JEDEC standard and holding-up implementers of that standard, including SanDisk, will cause it to achieve monopoly power.

111.    Round Rock's attempt to monopolize has caused SanDisk, as an implementer of the eMMC standard and purchaser in technology markets, to suffer antitrust injury.  The harm that SanDisk has experienced is injury of the type that the antitrust laws were intended to prevent and that flows from what makes Round Rock's acts unlawful.

a.  First, Round Rock has forced SanDisk to accept one of multiple anticompetitive injuries to its business.  Round Rock's monopolization means that San Disk must either stop manufacturing the embedded flash drives that Round Rock accuses of infringement, pay supracompetitive royalties and suffer higher production costs, or continue to pay the millions of dollars in costs and attorneys' fees required to defend multiple litigations.  In asserting undisclosed alleged SEPs against implementers of JEDEC standards, companies abusing the standard-setting process impose great costs on industry.  For instance, the former CEO of Round Rock's co-conspirator, Micron, testified that Rambus's hold-up of the DRAM industry cost Micron tens of millions of dollars and distracted valuable staff resources.

b.  Second, Round Rock's hold-up of memory-product manufacturers with supposed SEPs incents SanDisk to focus its technology and product development on areas lying clearly within the zone of freedom that its own patent portfolio provides, and to avoid standards using technologies over which patent assertion entities like Round Rock may later unexpectedly claim patent rights.  Indeed, the former CEO of Round Rock's co-conspirator, Steven Appleton, previously testified that failure by other JEDEC members to disclose would discourage Micron from participating in the standard-setting process in the future.

c. Third, Round Rock has imposed costs on SanDisk in the form of its executives' and employees' time in negotiating with Round Rock, and has forced SanDisk to operate under the shadow of litigation, all while being subject to licensing demands of more than a hundred million dollars.

## COUNT IV

### Breach of Contract

112.    SanDisk repeats and realleges each and every allegation of its Complaint.

113.    JEDEC has required committee members to disclose patents that "might be involved" in the committee's work or that are potentially essential to the proposed standard. This obligation is ongoing, reflecting the fact that JEDEC disfavors standards that read on patented technology.   By participating in JEDEC, a committee member disclosing a patent agrees to license it either at no charge or on RAND terms, or it "must withdraw from the committee no later than one-hundred twenty (120) calendar days" and risk having JEDEC reject the standard in favor of a design-around.  Micron executives have testified that, under JEDEC rules, a company that fails to disclose a patent that may relate to the committee's work foregoes its right to assert that patent against the resulting standard.  Indeed, Micron has taken the position in proceedings against Rambus that an appropriate royalty for an undisclosed alleged SEP later asserted against a standard is zero.

114.    According to Round Rock's allegations, Micron was under a contractual obligation to reveal the undisclosed alleged SEPs to the JC-64 committee and JC-64.1 subcommittee.   Micron's failure to disclose creates a contractual duty to abide by RAND licensing terms.  SanDisk is a third-party beneficiary of these contractual promises, which run with the encumbered patents.

41

115.    On information and belief, Round Rock took the undisclosed alleged SEPs and other patents subject to RAND and related encumbrances from its co-conspirator, Micron. Furthermore, on information and belief, Round Rock knew that Micron had not revealed the undisclosed alleged SEPs to JEDEC's JC-64 committee and 64.1 subcommittee. Round Rock assumed the burden of Micron's enforceable promise to license the alleged SEPs on RAND terms, which in this case are royalty free.

116.    Round Rock has breached its obligation to license the undisclosed alleged SEPs on RAND terms, which on the facts of this case entail licensing without compensation.

117.    Round Rock's breach of contract has injured SanDisk, subjecting it to the choice of continuing to pay millions of dollars in litigation expenses, ceasing to manufacture the accused products, or paying greater than RAND royalties (which, here, are royalty-free). Round Rock's breach of promise also deters SanDisk's participation in future standard-setting activities, distracts SanDisk's executives, and forces SanDisk to operate under the shadow of litigation.

## COUNT V

### Unlawful Restraint of Trade in Violation of the California Cartwright Act

118.    SanDisk repeats and realleges each and every allegation of its Complaint.

119.    Round Rock and Micron have entered into a trust in violation of the California Cartwright Act.

## COUNT VI

### Unlawful and Unfair Business Acts in Violation of the California Unfair Competition Law

120.    SanDisk repeats and realleges each and every allegation of its Complaint.

121.    In conspiring with Micron to suppress competition in the technology-licensing markets relevant to JEDEC's eMMC standard, and in monopolizing and conspiring to monopolize those markets, Round Rock is committing unlawful and unfair business acts and

practices and thus is engaging in unfair competition within the meaning of Section 17200 of the California Unfair Competition Law.

## DEMAND FOR JURY TRIAL

SanDisk hereby demands a trial by jury of all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, SanDisk prays for judgment as follows:

A.      That Round Rock's conduct be declared, adjudicated, and decreed a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and a breach of contract;

B.      That Round Rock's conspiratorial behavior and monopolization be enjoined under Section 16 of the Clayton Act, 15 U.S.C. § 25; Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code § 16750; and/or Section 17203 of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

C.      That SanDisk be awarded damages sufficient to compensate it for the injuries it has sustained on account of Round Rock's antitrust violations, to be trebled, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16750 of the California Cartwright Act, Cal. Bus. & Prof. Code § 16750;

D.      That SanDisk be awarded damages sufficient to compensate it for the injuries it has sustained on account of Round Rock's breach of contract;

E.  That judgment be rendered in favor of SanDisk;

F.  That SanDisk be awarded its costs of suit incurred in this action; and

G.  Such other and further relief as the Court shall find just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Plaintiff SanDisk Corporation*

OF COUNSEL:

Christopher S. Yates
Hanno Kaiser
Sarah M. Ray
Alan Devlin
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Christopher V. Ryan
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX  78746-7568
(512) 542-8400

Chuck P. Ebertin
VINSON & ELKINS LLP
1841 Page Mill Road, Suite 200-B
Palo Alto, CA  94304
(650) 687-8200

March 19, 2014